ALBERT E. DART *et al. vs.* RHODE ISLAND HOSPITAL
TRUST CO.

JUNE 12, 1923.

PRESENT: Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

*(1)   Wills.   Direction of Verdict.*

On motion to direct verdict in favor of a will, all evidence in favor of appellant must be taken as true, and appellant is entitled to the benefit of every favorable inference which may reasonably be drawn from the facts in evidence. If there is any legal evidence before the jury which would justify them in arriving at a contrary verdict the issue should be submitted to them.

*(2)   Wills.   Undue Influence.*

Where one having knowledge that testator had a mistaken belief in regard to another and that by reason thereof he would be likely to disinherit him to the advantage of the former, and having such knowledge fostered in the mind of testator false impressions relative to such person for the purpose of alienating the affections of testator, and influencing the testamentary disposition of his property and his conduct in so doing accomplished the result the will is produced by undue influence.

APPEAL from decree of probate court admitting will to probate. Heard on exception of appellants to direction of verdict and sustained.

RATHBUN, J.   This is an appeal from a decree of the Municipal Court of the city of Providence admitting to probate an instrument purporting to be the last will and testament of Edwin M. Dart.   The appeal was heard in the Superior Court by a justice sitting with a jury.   At the conclusion of the testimony said justice directed a verdict in

favor of the will. The case is before this court on the appellants' exceptions.

The appellants are children of Albert E. Dart, a deceased son of said Edwin M. Dart who deceased June 5, 1920. The instrument in question, hereafter referred to as the will, was executed on April 23, 1918, when said Dart, hereinafter referred to as the testator, was eighty-two or eighty-three years of age. Said testator at the time of the execution of the will and at the time of his decease was married to and living with his second wife. No children were born of the second marriage. Two children were born of his first marriage, namely, said Albert E. Dart, the father of the appellants, who died before the execution of the will, and Willard C. Dart, the principal beneficiary under the will. The estate was inventoried at $210,800.

The testator by his will provided for his wife, as follows: all household furniture and books were bequeathed to her. She was given the use of the testator's house at Warwick during her life and the trustee under the will was directed to pay her $1,800 annually during her life. The will provides that the wife of said Willard C. Dart shall have an estate for life, or so long as she shall remain the wife or widow of said Willard C. Dart, in the estate occupied by herself and family in Edgewood. The will provides that certain indebtedness shall be cancelled and that the Rhode Island Hospital Trust Company shall take the residue and remainder to hold during the life of the testator's widow in trust, to manage the estate, and after paying said widow $1,800 annually to permit the surplus income to accumulate during the life of said widow.

The will further provides that on the death of said widow said Willard C. Dart, provided he is then living, shall take an absolute estate in the remainder of the trust estate including accumulations; that if said Willard is not living at the death of said widow the lineal descendants of said Willard C. Dart by his said wife shall take an absolute estate in said remaining trust estate including accumulations;

that, in the event that neither Willard C. Dart nor any of his lineal descendants by his marriage with his said wife are living at the death of the testator's widow, the lineal descendants of Albert E. Dart (who are the appellants) shall take an absolute estate in one-half of said remaining trust estate and that the Home for Aged Men and Aged Couples shall take absolute estate in the other half of the remaining trust estate. None of the appellants take under the will except in the event that neither said Willard C. Dart nor any of his lineal descendants by his marriage with his said wife are living at the death of the testator's widow.

The twelfth clause provides in part as follows: "The nature of the provisions hereinbefore contained in favor of the lineal descendants of my son Albert E. Dart" (who was the father of these appellants) "has been determined by me in consideration of circumstances which to me appear satisfactory and sufficient."

The appellants relied upon the following reasons of appeal: (1) That at the time of the execution of the will the testator lacked testamentary capacity. (2) That the will "was procured to be made and executed by said Edwin M. Dart by undue influence exerted upon him by said Willard C. Dart, said Anna Cora Dart and other persons."

(1) The question presented is whether said justice erred in directing a verdict in favor of the will, In considering this question all evidence in favor of the appellants must be taken as true and the appellants "are entitled to the benefit of every favorable inference which may reasonably be drawn from the facts in evidence." *Dawley* v. *Congdon*, 42 R. I. at 71. If there was any legal evidence before the jury which would have justified them in arriving at a contrary verdict the issues should have been submitted to the jury. See *Reddington* v. *Getchell*, 40 R. I. 463.

The testator was on friendly terms with the appellants who were his grandchildren. At the time the will was executed he was eighty-two or eighty-three years of age and was very deaf. He harbored a very strong prejudice against any one

who smoked cigarettes. Witnesses testified that he was feeble and infirm, that at times his conversation was rambling and disconnected and that his memory was so defective that he would at times forget, within a few minutes, acts performed by himself. One of the appellants testified that in the summer of 1917 the testator "was failing very badly and his mind wasn't clear." He was unsuccessful in business until after he was sixty years of age. He frequently made the statement that he never had a nickel until he was sixty years old. The source of his fortune was a device which had been invented and patented by the father of the appellants. He told two of the appellants that he appreciated the fact that their father's invention gave him an opportunity to accumulate a fortune and that when he was dead the appellants would be well provided for. Before the will was executed the testator frequently told the different appellants that he would leave them all well provided for. In 1919, after the will was executed, the testator made a voluntary statement to the same effect to one of the appellants. The appellants at the time the will was executed and at the death of the testator were in humble circumstances. The testator at different times gave them some financial assistance.

Willard C. Dart was on very intimate terms with his father, the testator, who was accustomed to spend very much time at Willard's office. It appears that for a period of several years (including the time when the will was executed) up to the time of his last sickness he went, except when he was away from the city, to Willard's office either daily or on two or three days in each week. Willard testified that he asked his father to give him $1,000 and that thereafter his father gave him $500 every six months for a period of four or five years until the father's decease; that he asked his father to deed to him the house occupied by Willard and his family. He testified that his father several years before promised to give him the house but did not do so until requested; that his father, intending to give him a

one thousand dollar bond, by mistake delivered to him two bonds of the denomination of one thousand dollars; that when the mistake was discovered he told his father that he would like to keep both bonds and that his father consented. Within a period of six or seven years preceding the testator's death he made gifts to Willard and his family of money, securities and property, amounting to more than sixty thousand dollars in value. This amount includes a trust fund of $40,000, established primarily for the benefit of Willard's children by his present wife. Willard, after the will was made, asked his father to provide for him by will so that he would take without any "strings to it," within two years after his father's death whatever the father desired him to have. Willard had previously asked his father's attorney to attempt to procure such a provision in the father's will.

Some of the appellants testified that Willard was accustomed to advise them not to visit their grandfather and that if they refused to be guided by such advice he accompanied them to their grandfather's home and remained with them until the visit was ended; that Willard did not permit them to remain with their grandfather as long as they desired; that Willard was accustomed to say: "Well, you better not go over there. He isn't feeling very well, and you know what it will be,—it will be a lecture on smoking cigarettes and one thing and another, and you better not go over." Appellant Ralph E. Dart testified that he desired to write to his grandfather when he was spending the winter in Florida; that he was not permitted to write directly to his grandfather but was required to send the letters to Willard to be forwarded by him; that Willard said that such procedure was in accordance with the grandfather's wish. Appellant John M. Dart, before leaving to join the army, entered Willard's office and found his grandfather there. Said appellant testified as follows: "Willard asked me if I had any money, I said yes, some, and he says something to grandfather—I couldn't quite catch what it was—and

grandfather pulled out his wallet and handed me a ten dollar bill." At the time appellant Albert E. Dart entered the military service, Willard promised to obtain for him a two hundred and fifty dollar liberty bond. Willard said, "I will get grandfather to buy it for you." There was other evidence tending to show that for a considerable period, including the time when the will was executed, Willard exercised a strong control over his father.

The appellants' evidence tended to show that although Willard did not live with his father he attempted to prevent, and to a very great extent succeeded in preventing, the appellants in his absence from visiting their grandfather and that at the same time he was intentionally causing the appellants to believe that their grandfather would liberally provide for them.

The proponents introduced evidence tending either to contradict or explain some of the evidence to which we have referred. The question before us is not as to the weight of the evidence but whether there was any legal evidence upon which the jury might have based a contrary verdict.

It appears that at one time several years before the will was executed the appellants lived together; that the sister managed the home and the brothers boarded with her. According to the testimony of Willard, the testator was displeased with the boys because he thought they were not paying the sister a sufficient price for board. Whether he was or not (and the testimony was contradicted) is of little importance because it is clear that within a very short time the boys, whose wages in the meantime had been increased, paid their sister for board a price which was satisfactory to the testator. Willard testified as follows "404 Q. Have you in mind any grievance that Edwin M. Dart ever had against the Burrillville people or any of them, except what you have said about the boys' treatment of the girl? A. I think that was the principal one. 405 Q. Have you in mind any other? A. No. 406 Q. What if—can't think of any other grievance that your father ever expressed against

the Burrillville poeple except that one instance? A. Yes, there were other grievances. He didn't like the way the boys lived their lives. He wanted them to be a little bigger. He was very prejudiced against anybody who smoked cigarettes, very strong on temperance. 407 Q. Were those boys ever intemperate? A. I don't know. 408 Q. Well, did your father ever complain that any of those boys were at any time intemperate? A. I am afraid he thought so. 409 Q. Not what he thought but what he said. What did your father ever say to you at any time with reference to any of the intemperate habits of the Burrillville people? A. I wouldn't testify in regard to that because I know nothing concrete to give you." The above testimony contains an insinuation that the boys used cigarettes and intoxicants and that their habits were not good. It does not appear that any of the appellants were addicted to the use of intoxicants and if any of them used cigarettes it does not appear that they all did. Willard apparently knew as much, at least, about the habits of the appellants as did the testator. He was willing to insinuate that the testator was dissatisfied with the conduct of the appellants and that his dissatisfaction was not without cause, but he appeared to be unable to testify to facts. Did he know that his insinuations were unwarranted? Did he know that the testator had a mistaken belief as to the habits and conduct of the appellants and that by reason thereof he would be likely to disinherit them to the advantage of Willard? If Willard, having such (2) knowledge, fostered in the mind of the testator false impressions relative to the appellants for the purpose of alienating the affections of the testator and influencing the testamentary disposition of his propery, and his conduct in so doing accomplished that result, the will was procured by undue influence. *Friedersdorf* v. *Lacy*, 173 Ind. 429; *Johnson* v. *Johnson*, 20 Ky. L. Rep. 138; *In re Alexander*, 27 N. J. Eq. 463; *In re Budlong*, 126 N. Y. 423; *Greenwood* v. *Cline*, 7 Oregon, 17. Willard's testimony as to the supposed reasons for the testator's failure to provide for the appellants

in accordance with his intention as repeatedly expressed does not appear to us, to say the least, to be entirely frank. The jury after considering all the evidence might have found that Willard's conduct, in regulating the appellants' visits to the testator and their communications to him by mail, was more consistent with a successfully working plan or scheme to poison the testator's mind to the prejudice of the appellants than with any other theory.

We think there was some legal evidence from which the jury might have found that the testator, at the time the will was executed, and for a long time prior thereto, was in such a weak mental condition as to be easily imposed upon; that Willard either fostered or planted in the mind of the testator false impressions as to the habits and conduct of the appellants for the purpose of causing the testator to disinherit them and that the will was the product of such undue influence. We think the issues should have been submitted to the jury.

The exception to the direction of a verdict in favor of the will is sustained. The other exceptions are overruled and the case is remitted to the Superior Court for a new trial.

*William S. Flynn, McGovern & Slattery, Fred B. Perkins,* for appellants.

*Lyman & McDonnell, Tillinghast & Collins. Richard E. Lyman, James C. Collins,* for appellee.